IN THE UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| JMV Transportation & Logistics, Inc., <br><br> Plaintiff, <br><br> v. <br><br> Merchants Automotive Group, LLC, <br><br> Defendant. <br><br> Merchants Automotive Group, LLC <br><br> Counterclaim-Plaintiff, <br><br> v. <br><br> JMV Transportation & Logistics, Inc., <br> Michael Scott, and <br> Norman Victor Nettie, <br><br> Counterclaim-Defendants. | CIVIL ACTION NO. 1:24-cv-00155-SM |

**AMENDED CLASS ACTION COMPLAINT**

1.    Plaintiff JMV Transportation & Logistics, Inc. ("JMV"), individually and on behalf of all others similarly situated (the "Class," as more fully defined below), brings this class action against Defendant Merchants Automotive Group, LLC (doing business as and hereafter "Merchants Fleet") for breach of contract and breach of the duty of good faith and fair dealing, stemming from Defendant's improper remarketing practices for open-end vehicle leases in violation of Defendant's agreements with JMV and the Class.

1

**INTRODUCTION**

2.      Defendant Merchants Fleet provides commercial vehicle leasing to customers across the country who use vehicle fleets in their businesses. According to its website, Merchants Fleet "provid[es] highly customized fleet management and fleet leasing solutions to large business, mid-sized companies, governments, educational institutions, and more."[1]

3.      Plaintiff JMV is a transportation company that, among other services, provides package delivery services. Plaintiff and the other Class members contracted with Defendant Merchants Fleet to lease commercial vehicles. Plaintiff and the Class collectively paid millions of dollars to Merchants Fleet to lease commercial vehicles for their own business purposes.

4.      Among the services Merchants Fleet offers are "open-end" commercial vehicle leases. In simplified terms, under Merchants Fleet's open-end lease arrangement, the customer-lessee pays monthly lease payments to Merchants Fleet for leased vehicles pursuant to a payment schedule. At the expiration of the lease term, the leased vehicles are to be surrendered to Merchants Fleet, which is then required by the contract to sell the surrendered vehicles using commercially reasonable means.

5.      The outcome of these surrendered-vehicle sales has a direct financial consequence to Merchants Fleet's customer-lessees: Merchants Fleet's form open-end lease agreement provides for either a *refund* to the customer or a *charge* to the customer, based on the process Merchants Fleet engages in to take possession of the returned vehicles and, ultimately, to secure value Merchants Fleet realizes in the sale of the surrendered vehicles. Specifically, under the agreement, if a surrendered vehicle sells above Book Value (as defined in the parties' agreement), then

_____

[1] https://www.merchantsfleet.com/about/ (last visited May 24, 2024).

Merchants Fleet is required to *refund* the excess to the customer-lessee. But if the surrendered vehicle sells below Book Value, then Merchants Fleet *charges* its customer-lessees the amount of the difference.

6.      Because a customer-lessee may be refunded or charged based on the outcome of the process to take possession of a vehicle and the surrendered-vehicle sale, Merchants Fleet customers rely on Merchants Fleet—the party with the contractual responsibility to sell surrendered vehicles—to sell those vehicles in a commercially reasonable manner to maximize the value of the sale. This obligation to act commercially reasonable is memorialized in, and is an essential term of, the open-end lease agreement.

7.      This lawsuit challenges Merchants Fleet's failure to act in a commercially reasonable manner with respect to surrendered vehicles. In short, Merchants Fleet manipulates the surrender-and-sale process to maximize its own revenue to its customers' detriment. Merchants Fleet does so in several ways. For example, it fails to take possession of surrendered vehicles promptly, which causes it to charge its customers unnecessary lease and other fees that the customer would not incur if Merchants Fleet promptly took possession in compliance with the terms of its agreements. Merchants Fleet also manipulates the sales process of vehicles surrendered by its open-end lease customers at the end of their lease terms. Rather than sell these vehicles in a commercially reasonable manner, Merchants Fleet reserves its most profitable remarketing methods for its *own* vehicles—that is, vehicles where Merchants Fleet stands to gain or lose from the sale price—while sending open-end lease vehicles to an understaffed and poorly managed auction process.   Merchants Fleet also fails to record the transfer of surrendered vehicles appropriately, causing its lease customers to pay costs attributable to use of the vehicle, including

tolls imposed, well after the customer has surrendered the vehicle to Merchants Fleet.

8.      This action seeks to recover the substantial sums Merchants Fleet has cost its customers by failing to remarket surrendered open-end lease vehicles in a commercially reasonable manner, the fees it improperly assessed on JMV and the other Class members in connection with that process, the costs and other damages incurred by customers due to Merchants Fleet's failure accurately to record transfer of surrendered vehicles, as well as all damages authorized by law. The amount of damages is in the multiple millions of dollars.

## PARTIES

*Plaintiff*

9.      Plaintiff JMV is a corporation organized under the laws of the state of Georgia. JMV is a former customer of Merchants Fleet, that contracted with Merchants Fleet to lease approximately ninety-six commercial vehicles for its own package delivery business.

*Defendant*

10.     Defendant Merchants Automotive Group, LLC, is a corporation organized under the laws of the State of New Hampshire that does business under the trade name Merchants Fleet. According to the information Merchants Fleet has provided to the New Hampshire Secretary of State, Merchants Fleet has its principal office address and mailing address at 14 Central Park Drive, 1st Floor, Hooksett, NH, 03106.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(d)(2)(A), because the matter in controversy exceeds $5,000,000, and this is a class action in which members of the Class are citizens of states other than Defendant's states of citizenship.

12.     This Court has personal jurisdiction over Defendant because it is organized under the laws of the State of New Hampshire, conducted business in this District on a regular and continuous basis during the relevant time period, and Defendant is headquartered in this District. Further, the parties' agreement includes a contractual choice of law and venue provision, which provides that Defendant's customers consent and submit to the jurisdiction of the courts of the State of New Hampshire and the Federal District Court for the District of New Hampshire for purposes of any suit, action, or other proceeding arising out of the parties' agreement, which this action does. For these same reasons, venue is proper in this District.

## FACTUAL ALLEGATIONS

13.     Plaintiff and the other Class members are all persons or entities who contract with Merchants Fleet pursuant to an "open-end" commercial vehicle lease agreement.

14.     JMV executed an "Open-End Capital Master Lease Agreement" with Merchants Fleet dated effected as of April 20, 2020 (the "Agreement). A true and correct copy of the Agreement is attached as Exhibit A.

15.     The Agreement was prepared by Merchants Fleet. On information and belief, the Agreement is a form agreement and its key terms—including that Merchants Fleet must remarket vehicles in a commercially reasonable manner—are the same or are materially identical to and common to the agreements governing all open-end lease agreements between Merchants Fleet and its open-end lease customers.

16.     Under the Agreement, Merchants Fleet agreed to lease JMV one or more commercial vehicles for use in its business. Ex. A, ¶ 1.

17.     Between April 2020 and the Spring of 2023, JMV leased a total of approximately

ninety-six vehicles pursuant to the terms of the Agreement.

18.     Under the terms of the Agreement, the minimum lease period for each vehicle leased pursuant to the Agreement is at least three hundred sixty-seven (367) days (the "Lease Term"), beginning upon the customer's acceptance of each respective vehicle. Following the minimum Lease Term, leased vehicles are subject to a discretionary month-to-month term extendable only through the shorter of the set lease term or the amortization schedule the Agreement requires for each vehicle in the Agreement's Schedule A.

19.     Additionally, under Section 23 of the Agreement, Merchants Fleet's customers have the right to terminate any leased vehicle outside the 367-day minimum Lease Term upon thirty days' written notice. Section 9, in turn, provides that, at the end of the minimum Lease Term, customer may, upon ten days' written notice to JMV, deliver leased vehicles identified in a notice of termination to JMV at a mutually agreed upon location to surrender it.

20.     On February 22, 2023, JMV informed Merchants Fleet that it was terminating the leases for forty-two vehicles ("42 Noticed Vehicles") and requested information for surrender of those vehicles under Section 9 of the Agreement.

21.     Although Section 9 of the Agreement provides that surrender of vehicles shall be made within ten days' notice of lease termination, Merchants Fleet refused to take delivery of the 42 Noticed Vehicles.

22.     Further, even though JMV properly terminated the lease on the 42 Noticed Vehicles in February 2023, Merchants Fleet charged JMV for monthly lease payments after the termination was effective. This charge violated Section 7 of the Agreement, which provides that JMV only be charged through surrender "in accordance with Paragraph 9," which paragraph does not authorize

6

the collection of continued lease payments after a vehicle is surrendered.

23. On March 20, 2023, JMV informed Merchants Fleet that it was terminating the leases for an additional forty vehicles ("40 Noticed Vehicles"). JMV requested with its termination notice instructions for surrendering the additional 40 Noticed Vehicles. Merchants Fleet delayed in taking possession of these vehicles, like it had the first set of vehicles that JMV surrendered, and continued to charge lease payments notwithstanding the termination, which charges are not allowed under Section 7 of the Agreement.

24. Finally, on March 24, 2023, JMV informed Merchants Fleet that it was terminating the leases for the final fourteen vehicles ("14 Noticed Vehicles") that JMV had leased from Merchants Fleet. With this final termination, JMV effected termination of all vehicle leases it had with Merchants Fleet pursuant to the Agreement. As with the 42 Noticed Vehicles and 40 Noticed Vehicles, JMV requested with its termination notice instructions for surrendering the additional 14 Noticed Vehicles. Just as it had before, Merchants Fleet delayed in taking possession of these vehicles and continued to charge lease payments notwithstanding the termination and in violation of the Agreement.

25. The Agreement requires Merchants Fleet to take possession of surrendered vehicles at a mutually agreed upon location and then to sell those surrendered vehicles in a "commercially reasonable manner."

26. Merchants Fleet does not comply with these contractual obligations.

27. Merchants Fleet does not take surrendered vehicles promptly, which causes it to charge its customers unnecessary and unauthorized fees that the customer would not incur if Merchants Fleet took possession promptly and in accordance with the terms of its agreements.

28.     Here, although JMV gave notice of termination on each of February 22, March 20, 2023, and March 24, 2023, Merchants Fleet refused to take possession of the terminated vehicles within ten days of the respective terminations.

29.     Merchants Fleet breached its contractual obligations regarding sale of the surrendered vehicles in other ways.

30.     Following termination of a vehicle lease, Section 10 of the Agreement requires that Merchants Fleet solicit cash bids for the vehicle from prospective purchasers. Critically, Section 10 requires that all surrendered vehicles be sold "in a commercially reasonable manner."

31.     The contractual obligation that Merchants Fleet sell surrendered vehicles in a "commercially reasonable manner" is of the utmost importance to Merchants Fleet customers because the Agreement provides for either a *refund* or a *charge* to the customer based on and calculated from the outcome of the sale.

32.     Section 11 of the Agreement provides for a post-termination "rental adjustment" that is calculated from, among other things, the Net Proceeds (as that term is defined in the Agreement) of Merchants Fleet's sale of each surrendered vehicle. Specifically, if the Net Proceeds exceed the Book Value (again, as defined in the Agreement) of a surrendered vehicle, then the Agreement provides that Merchants Fleet is entitled to retain an amount equal to the Book Value and "remit or credit the excess" to the lessee-customer "as a refund of rental." Conversely, if the Net Proceeds are less than the Book Value, the Agreement requires that the lessee-customer "pay [Merchants Fleet] the amount of the difference" as a "Rental Charge."

33.     Section 10 of the Agreement provides that "Net Proceeds" are calculated as the sales proceeds less (1) "all direct sales expenses paid or incurred by Lessor" and (2) "Lessor's then

8

current sale fee."

34.    After a delay, Merchants Fleet finally took possession of the surrendered vehicles and then, upon information and belief, sold these vehicles. It did so at steep discounts off of what would be reasonably available market prices.

35.    Merchants Fleet sold these vehicles at a steep discount because it used a commercially unreasonable auction process. While Merchants Fleet boasts in marketing materials that it uses a "multichannel" remarketing process that sells vehicles in different ways (*i.e.*, to dealers or online) to maximize sale price, in reality, it only uses these other channels for vehicles where Merchants Fleet itself benefits from a higher sales price. For open-end lease vehicles— where the risk of gain or loss is on the customer—Merchants Fleet sends surrendered vehicles straight to auction.

36.    During the putative class period, those auctions were managed by an understaffed department within Merchants that was unable to monitor auctions and vehicles appropriately. During the putative class period, a team of only three to four remarketers managed the sales of thousands of open-end lease vehicles across over 280 different auction venues. Despite this huge volume, Merchants' remarketing department assigned auctions on an *ad hoc* basis and often did not establish clear, established lines of communication between auction venues and Merchants remarketers. The result was that many open-end lease vehicles went up on the auction block without anyone at Merchants actually monitoring the sale. As one employee within the department noted in 2024, "It's impossible to manage sales the way that they are currently operating."

37.    The sales price Merchants Fleet obtained for JMV's vehicles is far below prices what Merchants Fleet could have realized if it has sold the vehicles in a fair process and in

accordance with its contractual obligation to sell the vehicles in a commercially reasonable manner.

38.    Merchants Fleet's sales process is obviously deficient when its outcome is compared with the private sales process JMV employed at this time for vehicles it owned (as opposed to vehicles it leased from Merchants Fleet).

39.    For vehicles JMV owned (rather than leased from Merchants Fleet) and that were similar to those it leased from Merchants Fleet, JMV was able to obtain thousands of dollars more than Merchants Fleet was able to obtain by using means of sale no more complicated than Facebook Marketplace.

40.    Moreover, from these below-market sales proceeds, Merchants further deducted (1) a per-vehicle sale fee of $225.00 and (2) over $50,000 in sale and transportation expenses.

41.    ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

42.    ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

43.     Indeed, Merchants based its remarketing strategy in part on these rebates, citing in internal documents increased rebate value as a reason for a 2024 consolidation strategy that shifted more vehicles to Manheim.

44.     These rebates were lucrative for Merchants.  From 2022 through 2024, Merchants received approximately ▮▮▮▮▮▮▮ in rebates, thereby offsetting its selling expenses by that amount.  Merchants, however, did not pass any of these rebates on to JMV or any other open-end lease customers.  Instead, Merchants charged open-end lease customers the full pre-rebate cost of auctioning a vehicle, even for vehicles that subsequently earned Merchants a rebate on those same expenses.

45.     Merchants Fleet also breached the Agreement by failing to record the transfer of surrendered vehicles appropriately.

46.     After taking possession of the vehicles JMV surrendered, Merchants Fleet failed to document the transfer of those vehicles appropriately. Even months after Merchants Fleet reported to JMV that the vehicles were sold, because Merchants Fleet had not properly documented the transfer of such vehicles, JMV received notices and invoices from state authorities purporting to impose fines on JMV for alleged failure to pay tolls associated with these vehicles.

47.     JMV had long before surrendered these vehicles, and it was incumbent on Merchants Fleet to record the surrender and transfer effectively so that state registrations were updated and tolls associated with these vehicles were charged to the new lessors or new owners of those vehicles.

48.     Merchants Fleet's delay and failure to record the transfer of these vehicles appropriately is a further failure to act in a commercially reasonable manner related to the

surrender of vehicles, as Merchants Fleet was required under the Agreement.

49.    In sum, while Merchants Fleet promises in its customer agreements to sell surrendered vehicles in a commercially reasonable manner, in reality, Merchants Fleet unreasonably and intentionally violates its contractual agreements and harms its customers by selling surrendered vehicles through a commercially unreasonable auction process, all while reserving other, more profitable remarketing channels for its own vehicles.

## CLASS ACTION ALLEGATIONS

50.    Plaintiff brings this action pursuant to Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure individually and on behalf of all others similarly situated.

51.    Plaintiff seeks to represent the following class ("the Class"):

All persons or entities who leased vehicles from Merchants Fleet pursuant to Merchants Fleet's open-end master lease agreement and whose vehicles were surrendered pursuant to the terms of the agreement.

52.    Excluded from the Class is Defendant Merchants Fleet and any of its members, affiliates, parents, subsidiaries, officers, directors, employees, successors, or assigns; the judicial officers, and their immediate family members; and Court staff assigned to this case. Plaintiff reserves the right to modify or amend the Class definition, as appropriate, during the course of this litigation.

53.    This action has been brought and may properly be maintained on behalf of the Class proposed herein under the criteria of Rule 23 of the Federal Rules of Civil Procedure.

54.    **Numerosity – Federal Rule of Civil Procedure 23(a)(1).** The members of the Class are so numerous and geographically dispersed that individual joinder of all class members is impracticable. Merchants Fleet operates nationally and, upon information and belief, there are

12

thousands of members of the Class. The precise number of Class members is presently unknown to Plaintiff, but may be ascertained from Defendants' books and records. Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice.

55.     **Commonality and Predominance – Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3).** This action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including, without limitation:

a. whether Defendant engaged in the conduct alleged herein;

b. whether Defendant's alleged conduct violates applicable law;

c. whether Merchants Fleet breached its contracts with Plaintiff and the other Class members by charging them unauthorized fees and other amounts related to the surrender of leased vehicles, including expenses for which Merchants subsequently received rebates;

d. whether Merchants Fleet breached its contracts with Plaintiff and the other Class members by failing to sell surrendered vehicles in a commercially reasonable manner;

e. whether Merchants Fleet unlawfully manipulated its discretionary authority under its contracts with Plaintiff and the other Class members to its benefit and to Plaintiff's and the other Class members' detriment;

f. whether Defendant's conduct caused Plaintiff and the other members of the Class to suffer a compensable loss;

g. whether Class members are entitled to damages, restitution, restitutionary

disgorgement, equitable relief, exemplary damages, and/or other relief; and

h.  the amount and nature of relief to be awarded to Plaintiff and the other Class members.

56.  **Typicality – Federal Rule of Civil Procedure 23(a)(3).** Plaintiff's claims are typical of the other Class members' claims because Plaintiff and each of the other Class members were customers of Merchants Fleet who leased commercial vehicles from Merchants Fleet pursuant to a form contract, and as to whom Merchants Fleet charged unauthorized fees and failed to live up to its contractual promises. Plaintiff and the other Class members suffered damages as a direct and proximate result of the same wrongful practices in which Defendant engaged. Plaintiff's claims arise from the same practices and course of conduct that give rise to the claims of the other Class members.

57.  **Adequacy of Representation – Federal Rule of Civil Procedure 23(a)(4).** Plaintiff is an adequate Class representative because its interests do not conflict with the interests of the other members of the Class that it seeks to represent, Plaintiff has retained counsel competent and experienced in complex class action litigation, and Plaintiff intends to prosecute this action vigorously. The Class's interests will be fairly and adequately protected by Plaintiff and its counsel.

58.  **Declaratory and Injunctive Relief – Federal Rule of Civil Procedure 23(b)(2).** Defendants have acted or refused to act on grounds generally applicable to Plaintiff and the other Class members, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the Class as a whole.

59.  **Superiority – Federal Rule of Civil Procedure 23(b)(3).** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no

14

unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiff and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, so it would be impracticable for the Class members to individually seek redress for Defendants' wrongful conduct. Even if the Class members could afford litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## **CLAIMS ALLEGED**

### **COUNT I**
### **BREACH OF CONTRACT (FAILURE TO REMARKET IN COMMERCIALLY REASONABLE MANNER)**

60.     Plaintiff realleges and incorporates by reference the allegations in the foregoing numbered paragraphs as if fully set forth herein.

61.     The Agreement, and similar agreements signed by other Class members, is a contract between Plaintiff and each of the other Class members, on the one hand, and Merchants Fleet, on the other hand.

62.     Merchants Fleet has breached the essential terms of the contract.

63.     Merchants Fleet promised Plaintiff and each of the Class members in the Agreement that it would sell surrendered vehicles in a "commercially reasonable manner." Merchants Fleet breached the Agreement with Plaintiff and each of the other Class members by

failing to sell the vehicles in a "commercially reasonable manner," and thus either charging Plaintiff and the other Class members more than the Agreement authorized or paying less in rebates to Plaintiff and the other Class members than the Agreement required. Merchants Fleet also failed to record the transfer of surrendered vehicles appropriately, causing Plaintiff and the other Class members to incur further damages as described in this Complaint.

64.    Plaintiff and the other Class members have suffered actual injury and damages as a consequence of Merchants Fleet's breaches, in an amount to be proven at trial.

## COUNT II
### BREACH OF CONTRACT (CHARGING OF IMPROPER SALES EXPENSES)

65.    Plaintiff realleges and incorporates by reference the allegations in the numbered paragraphs 1 through 59 as if fully set forth herein.

66.    The Agreement, and similar agreements signed by other Class members, is a contract between Plaintiff and each of the other Class members, on the one hand, and Merchants Fleet, on the other hand.

67.    Merchants Fleet has breached the essential terms of the contract.

68.    Merchants Fleet promised Plaintiff and each of the Class members that, to arrive at "Net Proceeds," it would deduct from the sales proceeds only (1) a sales fee and (2) "direct sales expenses paid or incurred by" Merchants.

69.    However, Merchants received at least ███████ in rebates from auction venues where it sold open-end lease and other vehicles.  At least some portion of those rebates were to offset the expenses of selling open-end lease vehicles that Merchants had charged to the open-end lease customer.  Merchants did not pass along any portion of these rebates to open-end lease

customers, instead keeping the full amount for itself.

70.     Merchants accordingly breached the Agreement by charging JMV and other Class members more than the actual "direct sales expenses" that Merchants was entitled to deduct under the Agreement.

71.     Plaintiff and the other Class members have suffered actual injury and damages as a consequence of Merchants Fleet's breaches, in an amount to be proven at trial.

<u>COUNT III</u>
**BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING**

72.     Plaintiff realleges and incorporates by reference the allegations in the numbered paragraphs 1 through 59 as if fully set forth herein.

73.     Merchants Fleet's open-end lease agreement with Plaintiff and with the other Class members requires Merchants Fleet to take possession of surrendered vehicles at a mutually agreed upon location and then to sell those surrendered vehicles in a "commercially reasonable manner."

74.     The requirement that Merchants Fleet unilaterally sell surrendered vehicles in a "commercially reasonable manner" invests Merchants Fleet with a degree of discretion in performance of the contract that, if not exercised in good faith and with fair dealing, deprives Plaintiff and the other Class members of a substantial proportion of the agreement's value.

75.     The Agreement and New Hampshire law impose upon Merchants Fleet an implied covenant of good faith in its contractual performance.

76.     Merchants Fleet violated this implied covenant of good faith by, *inter alia*, manipulating the surrender process, charging fees and expenses not authorized by the Agreement, failing to sell surrendered vehicles in a commercially reasonable manner, and failing properly to

17

record transfer of surrendered vehicles.

77. Merchants Fleet's conduct exceeds the limits of reasonableness and violates community standards of honesty, decency, and reasonableness.

78. Plaintiff and the other Class members have suffered actual injury and damages as a consequence of Merchants Fleet's breaches of the implied covenant, in an amount to be proven at trial.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of the other Class members it seeks to represent, respectfully requests that the Court enter judgment in his favor and against Defendant, as follows:

1. Declaring that this action is a proper class action, certifying the Class as requested herein, designating Plaintiff as Class Representative, and appointing Plaintiff's attorneys as Class Counsel;

2. Ordering Defendant to pay actual damages (including punitive or enhanced compensatory damages) and restitution to Plaintiff and the other Class members, as allowable by law;

3. Ordering Defendant to pay both pre- and post-judgment interest on any amounts awarded;

4. Ordering Defendant to pay attorneys' fees and costs of suit; and

5. Ordering such other and further relief as may be just and proper.


Dated:  February 13, 2026

/s/ Edward J. Sackman
Edward J. Sackman, N.H. Bar #19586
**BERNSTEIN, SHUR, SAWYER &
NELSON, P.A**
670 N. Commercial Street, Suite 108
P.O. Box 1120
Manchester, New Hampshire 03105
(603) 623-8700
nsackman@bernsteinshur.com

/s/
Tyler W. Hudson* (KS # 20293)
**WAGSTAFF & CARTMELL, LLP**
4740 Grand Avenue, Suite 300
Kansas City, MO 64112
Tel: 816-701-1100
thudson@wcllp.com

*\* pro hac vice*

/s/
Joshua P. Gunnemann*
Ga. Bar No. 152250
Jonathan R. Chally*
Ga. Bar No. 141392
Benjamin B. Watson*
Ga. Bar No. 632663
**COUNCILL, GUNNEMANN &
CHALLY, LLC**
75 Fourteenth Street NE, Suite 2475
Atlanta, Georgia 30309
Tel:  404-407-5250
JChally@cgc-law.com
JGunnemann@cgc-law.com
BWatson@cgc-law.com

**Counsel for Plaintiff and the Proposed Class**

19